**UNITED STATES of America Plaintiff**

v.

**Miguel RIVERA–HERNANDEZ Defendant**

**No. CRIM.03–137CCC.**

United States District Court, D. Puerto Rico.

Aug. 4, 2004.

cancellation of her benefits, was unsupported by the evidence.

Rebecca Kellogg–De–Jesus, United States Attorney's Office, Torre Chardon, San Juan, PR, for Plaintiff.

Jose R. Gaztambide–Aneses, San Juan, Ricardo R. Pesquera–Annexy, Ricardo R. Pesquera P. A., Orlando, FL, for Miguel Rivera–Hernandez.

## ORDER

CEREZO, District Judge.

Having considered the Magistrate–Judge's Report and Recommendation Re: Conflict of Interest filed by Magistrate–Judge Delgado–Colón on October 21, 2003 (docket entry 25), to which no objection has been filed,[1] the same is APPROVED and ADOPTED. Accordingly, the United States' request for the disqualification of attorneys José Gaztambide and Ricardo Pesquera as counsels for defendant Miguel Rivera–Hemández is DENIED.

SO ORDERED.

### *MAGISTRATE–JUDGE'S REPORT AND RECOMMENDATION RE: CONFLICT OF INTEREST*

DELGADO-COLON, United States Magistrate Judge.

### I. Procedural Background

On May 12, 2003, the Grand Jury issued a two-count indictment against Miguel Rivera–Hernández (hereafter "Rivera–Hernández") charging him with violations to Title 18 U.S.C. §§ 1951 and 1957: fraud or extortion under color of official right and engaging in monetary transactions with criminally derived property (Docket No.

---

1. The United States did seek reconsideration from the Magistrate–Judge of her Report and Recommendation on January 8, 2004 (docket entry 33), but the Magistrate–Judge denied said request on June 28, 2004 (docket entry 40). Once the Magistrate–Judge denied the reconsideration request, the United States failed to raise objections before the Court to either the Report and Recommendation or the Order denying the reconsideration.

2). Attorneys Ricardo Pesquera (hereafter "Attorney Pesquera") and José Gaztambide (hereafter "Attorney Gaztambide") have filed notices of appearances on Rivera–Hernández's behalf, being Attorney Pesquera the one acting as lead counsel (Docket Nos. 7 and 10).

The government, through Assistant U.S. Attorney Rebecca Kellogg, on June 11, 2003, petitioned the Court for an evidentiary hearing asserting that both attorneys do "have conflict in their representation of defendant and his father who is a witness against the defendant" (Docket No. 14).

Having the matter been referred for Report and Recommendation, a hearing was held on July 18, 2003 (Docket Nos. 19 and 24).

At the hearing Assistant U.S. Attorneys Rebecca Kellogg and Nereida Meléndez proffered a summary of the events upon which the government's motion is premised and submitted, for an in-chambers inspection, the Grand Jury testimonies of Miguel Rivera–Díaz and two prospective cooperating witnesses (Govt. Ex. 1 and 2). Defendant Rivera–Hernández appeared represented by Attorneys Pesquera and Gaztambide. While Attorneys Pesquera and Gaztambide proffered and summarized the extent of their participation in the case, Attorney Pesquera went further in discussing applicable case law.

Based on the arguments and evidence presented, the following are the facts deemed proven, most of which are uncontested.

## II. Factual Background

### A. Proven Facts

On October 31, 2002, the Grand Jury issued a subpoena directed to "Multi–Equipment Repair and Services, Custodian of Records" (hereafter "Multi–Equipment") demanding the production of "all invoices, bills and payment between Multi–Equipment and Eileen Baressi Ramos." The requested documents were to be tendered by November 13, 2002 (government Exh. I, No. 1). Reportedly, Miguel Rivera–Díaz was the owner and/or President of Multi–Equipment.

Two days prior to the due date, on November 11, 2002, Attorney Pesquera sent a letter to Assistant U.S. Attorney Edna Rosario in which he reported having been recently retained by the corporation and that he was in need of additional time in order to identify, gather the documents and be in a position to comply with the subpoena. In his letter Attorney Pesquera informed Multi–Equipment had been closed for "approximately over a year" and inquired whether the corporation was a "target or suspect" of the Grand Jury investigation (Government.Ex. I, No. 2). Following an unsuccessful attempt to get the subpoena quashed, counsel Pesquera, on December 2, 2002, submitted to the government all documents requested from Multi–Equipment (Govt.Exh. I, No. 6).

Four months later, on April 7, 2003, a second subpoena was issued. This time demanding the appearance and testimony before the Grand Jury of Miguel Rivera–Díaz (hereafter "Rivera–Díaz") on April 11, 2003. Once again, Attorney Pesquera wrote and advised the attorney for the government he had been retained to represent Rivera–Díaz in his personal capacity and, while raising his client's Fifth Amendment rights, requested to have Rivera–Díaz excused from appearing before the Grand Jury (Govt.Exh. I, No. 8).

Subsequently, on April 29, 2003, the U.S. Attorney's Office received the Department of Justice's authorization to grant immunity to Rivera–Díaz, fact that was reported to Attorney Pesquera, in writing, on May 1, 2003. Rivera–Díaz was then summoned

to appear before the Grand Jury on May 7, 2003 (Govt. Exh. I, Nos. 9 and 11).

On the same date that Attorney Pesquera was informed that immunity had been granted to Rivera–Díaz (May 1, 2003), the government sent a letter addressed to Miguel Rivera–Hernández (Rivera–Díaz's son). This time notice was given to Rivera–Hernández of the fact that he was a "target" of a federal investigation and invited him to appear and testify before the Grand Jury also on May 7, 2003 (Govt.Exh. I, No. 10).

In a subsequent letter also dated May 1, 2003, but that appears was faxed to the U.S. Attorney's Office on May 6, 2003, at 1:57 PM, Attorney Pesquera invokes his client's Fifth Amendment rights and assures the attorney for the government that "if and when an indictment is returned against Mr. Rivera–Hernández" that his client will surrender and appear without need of an arrest warrant to be issued. This time Attorney Pesquera was appearing on behalf of Rivera–Hernández, target of the investigation (Govt.Exh. I, No. 12).

Also on May 6, 2003, Attorney Pesquera announced he was no longer representing Rivera–Díaz, that Attorney José Pagán was the new legal representative for Rivera–Díaz and that he understood Mr. Rivera–Díaz could appear before the Grand Jury on May 9, 2003 [1] (Govt.Exh. I, No. 13).

The parties' factual allegations commence to differ on the same date Rivera–Díaz appeared before the Grand Jury, May

12, 2003. At the time he appeared represented by Attorney José Gaztambide who remained available for consultation throughout Rivera–Díaz's appearance before the Grand Jury. Reportedly, prior to appearing before the Grand Jury, Attorney Gaztambide and Rivera–Díaz had spoken twice. The first time was a telephone conversation during which Attorney Gaztambide advised his client of the procedural aspects regarding his appearance and the implications of being granted immunity.

In the morning hours of May 12, 2003, Rivera–Díaz appeared and testified before the Grand Jury. While providing testimony he was confronted with several invoices regarding services for equipment repairs allegedly provided by his company and several checks issued to or for his company, Multi–Equipment, in payment of services allegedly rendered. An examination of his testimony reflects that Rivera–Díaz generally claimed not exactly knowing the particulars of the events reflected on the invoices, that the information within could have been provided by his son Rivera–Hernández, though he was not absolutely sure and that the repair services claimed were not rendered by Multi–Equipment. It is also clear from the Grand Jury transcript of Rivera–Díaz's testimony that during the initial stages of his interrogation, Rivera–Díaz's responses to the prosecutor's questions were inconclusive. He resorted to phrases like "I am not absolutely sure," or "I don't recall," or "might have

---

**1.** It is gleaned from the record that Attorney José Pagán had a calendar conflict on May 7, 2003, and was arranging for a re-scheduling of Rivera–Díaz's appearance before the Grand Jury (Govt.Exh. I, No. 14). Since Attorney Pagán and the attorney for the government were not able to agree on a new date, Attorney Pagán moved to have the subpoena quashed. This request the government opposed. At the time the government also re-

quested the Court to compel Rivera–Díaz to appear before the Grand Jury as a witness who had been granted immunity (Govt.Exh. I, No. 15). Given the fact that the Motion to Quash and the opposition were filed on May 7, 2003, and May 8, 2003, respectively, Rivera–Díaz's subsequent appearance before the Grand Jury was re-scheduled for May 12, 2003.

been." Later, at some point during the noon recess, Rivera–Díaz was able to consult and seek advice from Attorney Gaztambide in regards to the invoices and checks with which he was being confronted. Reportedly, by answering to these sets of questions he was to implicate his son, Rivera–Hernández. It was Attorney Gaztambide's advice to Rivera–Díaz that he was to testify truthfully. Thereafter, the prosecutor continued to interrogate Rivera–Díaz on the same subject. An examination of Rivera–Díaz's testimony reveals this time he was responsive and provided concrete responses. These events are depicted and corroborated by the prosecutor's introductory remarks before the Grand Jury while initiating the afternoon session. The record reflects that the prosecutor stated:

Q. Now, sir, during the break, you and I, with your attorney present, were taking about the invoices, and how you received the information to prepare them. Do you recall that?

A. That's correct.

Q. Please explain to the members of the grand jury how did you receive the information, and instructions, to prepare these invoices, in the name of Ingenieros y Proyectistas.

A. Well, through my son, I received the information to prepare some quotations, and then some invoices.

Q. Which one of your sons are you referring to?

A. Miguel A. Rivera-Hernandez.

(Government Exh. 2, Transcript of Testimony of Rivera–Díaz at p. 41)

In regards to what transpired during the conversation between Attorney Gaztambide and Rivera–Díaz prior to his Grand Jury appearance, it is the government's contention that Rivera–Díaz must have discussed his testimony with Attorney Gaztambide. This, the government

asserts, is a fact that could be presumed. Attorney Gaztambide, however, assures this initial conversation centered on the procedural aspects of his client's appearance before the Grand Jury. In regards to the attorney-client conversation that did take place during the noon recess of the Grand Jury session, it is Attorney Gaztambide's recollection that Assistant U.S. Attorney Meléndez was nearby in the corridor leading to the Grand Jury room and later she went into the Grand Jury room. Nonetheless, she did not participate in the conversation when Attorney Gaztambide briefly spoke to his client. Reportedly, at the time Rivera–Díaz showed him or talked to him about some vouchers and invoices he was being shown and confronted with as well as some payments made to Rivera–Hernández's wife. Attorney Gaztambide asserts he limited himself to instruct Rivera–Díaz "to be truthful and give straight answers." Attorney Gaztambide also recounted that after the Grand Jury session was over he was informed that a true bill had been issued against Rivera–Hernández. Attorney Gaztambide proffered that Assistant U.S. Attorney Kellogg asked him whether he could get in the case and help with the case of Rivera–Hernández, who was to be arrested. At the time, Assistant U.S. Attorney Kellogg was placed on notice that Attorney Pesquera was counsel for Rivera–Hernández. Thereafter, Attorney Gaztambide called Attorney Pesquera and reported the events of the day. Later on Attorney Gaztambide was asked to join in the defense of Rivera–Hernández.

Attorney Gaztambide assured Rivera–Hernandez voluntarily surrendered to the U.S. Marshal Service on May 14, 2003. While Attorney Gaztambide recalls he was asked whether he could take Rivera–Hernández to either the U.S. Attorney's Office (Assistant U.S. Attorney Kellogg's office)

or the Federal Bureau of Investigation, he declined the invitation and led Rivera–Hernández to the U.S. Pretrial Service Office.

The government's evidence demonstrates that on April 11, 2003, and May 7, 2003, two other witnesses appeared and testified before the Grand Jury. They both, through their testimonies, directly implicated Rivera–Hernández in the scheme of actions described within the true bill rendered by the Grand Jury on May 12, 2003 (the one against Rivera–Hernández) (Docket 2). (*See also* Govt. Exh. I, No. 17.) The indictment remained sealed until the date in which Rivera–Hernández surrendered and was arrested. On this same date, Attorney Gaztambide filed a notice of appearance on behalf of defendant Rivera–Hernández (Govt. Exh. I, No. 18, and Docket No. 7). On May 20, 2003, Attorney Pesquera filed a Notice of Appearance on Rivera–Hernández's behalf (Govt. Ex. I, No. 19, and Docket No. 10).

Thereafter, on June 3, 2003, the government provided written advanced notice to Attorneys Pesquera and Gaztambide of its intention to request a conflict of interest hearing as it was actually done on June 9, 2003 (Govt. Exh. I, No. 20; Docket No. 14).

## B. Parties' Contentions

At the conflict of interest hearing the government summarized the gist of it theory by asserting that a defendant's right to counsel of choice is not absolute but rather subjected to certain limitations. In support the government relies on *In Re Grand Jury Proceedings*, 859 F.2d 1021 (1st Cir.1988).

It is the government's proposition that under the competency of counsel standard, it could be assumed and presumed that counsel met with his client to discuss the case factual background, event which led Attorney Pesquera to assert Rivera–Díaz's rights under the Fifth Amendment to the U.S. Constitution. Therefore, the government agrees that being Attorney Pesquera presumably privy to statements made by Rivera–Díaz, he now has a conflict in representing his son, Rivera–Hernández. The same theory is applicable to Attorney Gaztambide's participation in the case.

In regards to each one of his appearances, Attorney Pesquera counters and alleges as follows:

a. Multi–Equipment

At the time he was retained to respond to the Grand Jury subpoena, Multi–Equipment had ceased operations some time ago (at the time for over a year, over two years now) and all documents requested by the Grand Jury were turned over to the government. Attorney Pesquera's role was that of an intermediary between the corporation and the U.S. Attorney's Office.

b. Mr. Rivera–Díaz

The first contact held with Rivera–Díaz was by telephone. Attorney Pesquera who was and resides in Florida was contacted by telephone by Rivera–Díaz. Counsel assures he only inquired whether there were any possibilities that Rivera–Díaz would incriminate himself. Upon receiving an affirmative response, Attorney Pesquera opted to move to have the subpoena quashed but did not further discuss the case or facts with Rivera–Díaz.

Meanwhile, Attorney Pesquera remained in contact with the attorneys for the government who kept him apprised of its endeavors to obtain authorization to grant immunity to Rivera–Díaz, inasmuch as it was Rivera–Hernández the target of the investigation. Once said notice was received, Rivera–Díaz and Attorney Pesquera discussed the possi-

bility of obtaining separate counsel for Rivera–Díaz and have Attorney Pesquera undertake the legal representation of Rivera–Hernández. Rivera–Díaz assured he retained the legal services of Attorney José Pagán (who moved to quash the Grand Jury subpoena) and Attorney Gaztambide, who represented him before the Grand Jury (Deft's Exh. A: Sworn Statement, ¶¶ 1–5). Reportedly, prior to appearing before the Grand Jury, Rivera–Díaz did not discuss the facts of this case with either Attorney Pesquera or Attorney Gaztambide, but rather agreed to meet with Attorney Gaztambide on May 12, 2003, within the court premises adjacent to the "Grand Jury Area" (Defendant's Exh. A, ¶¶ 6 and 7).

While the government "presumes" that Attorney Pesquera and Rivera–Díaz must have discussed the factual scenario as it relates to the case at bar, Attorney Pesquera asserts he did not as he would not have allowed for such conversation to take place by telephone. More so, the defense argues that a government "assumption" is not the proper legal standard to define the existence of conflicting interests.

In regards to Attorney Gaztambide's participation, it is undisputed he assisted Rivera–Díaz on the date the latter appeared before the Grand Jury. It is also undisputed Attorney Gaztambide conferred with his client in the corridor and that he instructed his client to "tell the truth at all times" and that, thereafter, the government, relying on the truthfulness of Rivera–Díaz and his readiness to testify, resumed the afternoon session before the Grand Jury by making such fact known to the Grand Jury. After Rivera–Díaz's testimony, and being Rivera–Díaz the third witness to testify in regards to Rivera–Hernández's actions, a true bill was rendered against Rivera–Hernández.

The defense alleges that prior to Rivera–Díaz testifying before the Grand Jury they were never informed or privy of any other version of facts other than the one actually given by Rivera–Díaz to the Grand Jury. Said information was voluntarily provided to them after the Grand Jury session by a person who was a witness before the Grand Jury and who is not a co-defendant to Rivera–Hernández. More so, Rivera–Díaz submitted a written sworn statement assuring that there were no confidential attorney-client communications held with Attorneys Pesquera and Gaztambide and that the decisions as to counsel representation have been undertaken as the case developed based on the government's communications (Defendant's Exh. A: Sworn Statement).

Further, the defense highlights the government cannot proceed on mere assumptions of facts but rather has to establish the confidentiality of an attorney-client relationship that is to be violated were they (Attorneys Pesquera and Gaztambide) to cross-examine Rivera–Díaz at trial. In other words, the government must establish the existence of a potential or actual conflict of interest.

## III. Analysis

### A. Legal Standard

"In all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense" (Sixth Amendment to the U.S. Constitution). In recognizing this constitutional principle, the U.S. Supreme Court has stated there is a presumption in favor of the defendant's choice of counsel. *Wheat v. United States*, 486 U.S. 153, 164, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988); *Powell v. Alabama*, 287 U.S. 45, 53, 53 S.Ct. 55, 77 L.Ed. 158 (1932). This presumption may be overcome by a showing of actual con-

flict or a serious potential for conflict. *Wheat v. United States*, 486 U.S. at 164, 108 S.Ct. 1692. The underlying and governing principle is that "while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *United States v. Driscoll*, Crim. A. No. 94–10153RCL, 1994 WL 549504 at *2 (D.Mass. Oct.4, 1994), citing *Wheat v. United States*, 486 U.S. at 159, 108 S.Ct. 1692.

■ Notwithstanding the fundamental importance of an accused's right to counsel of his choice, the right is not absolute. A criminal defendant, while exercising his right, cannot unduly hinder the fair, efficient and orderly administration of justice. *United States v. Panzardi*, 816 F.2d 813, 815 (1st Cir.1987), citing *United States v. Diozzi*, 807 F.2d 10, 12 (1st Cir.1986); *United States v. Allen*, 789 F.2d 90, 92 (1st Cir.), *cert. denied*, 479 U.S. 846, 107 S.Ct. 164, 93 L.Ed.2d 103 (1986).

Therefore, trial courts have been recognized some discretion in setting rules and principles and making determinations in order to preserve the highest ethical standards of professional responsibility.[2] *United States v. Panzardi*, 816 F.2d at 816–17; *Kevlik v. Goldstein*, 724 F.2d 844, 847 (1st Cir.1984); *United States v. Cunningham*, 672 F.2d 1064 (2nd Cir.1982).

■ When alerted as to the possible existence of a conflict of interest, the court must take proper steps to ascertain whether the conflicts warrant separate counsel. *Wheat v. United States*, 486 U.S. at 160, 108 S.Ct. 1692; *United States v. Lanoue*, 137 F.3d 656, 664 (1st Cir.1998) (the potential for conflict is a matter that is uniquely factual and presents a special dilemma for trial courts).

■ In making such determination, a trial court has substantial latitude in evaluating the facts and circumstances of each case. *Wheat v. United States, 486 U.S.* at 163–164, 108 S.Ct. 1692. Still, trial courts are not to unnecessarily obstruct or impede a defendant to be represented by counsel of his choice and disqualification of counsel should be a measure of last resort. *United States v. Driscoll*, 1994 WL 549504 at *3, citing *In Re Grand Jury Proceedings*, 859 F.2d 1021 (1st Cir.1988); *United States v. Diozzi*, 807 F.2d at 12 (disqualification is warranted when the court finds either an actual conflict or a serious potential conflict).

■ The decision to disqualify an attorney for conflict of interest is subject to review under an abuse of discretion standard. *United States v. Lanoue*, 137 F.3d 656, 663 (1st Cir.1998); *Fiandaca v. Cunningham*, 827 F.2d 825 (1st Cir.1987).

---

**2.** Under Rules of Professional Responsibility (RPR) adopted by the District Court of Puerto Rico from the Model Rules of Professional Conduct of the American Bar Association, Rule 1.7—Conflict of Interest: General Rule reads as follows:

  (a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

  (1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

  (2) each client consents after consultation.

  A similar principle in embodied in RPR, Rule 1.9 which states:

  (a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interest are materially adverse to the interests of the former client unless the former client consents after consultation.

] In a case where the government seeks the disqualification, the government carries a heavy burden in demonstrating that disqualification is justified. While the trial court must inquire and explore whether such actual or serious potential conflict exists, the court may rely on counsel's representations assuring that no such conflict exists. *United States v. Santiago–Lugo*, 167 F.3d 81 (1st Cir.1999), citing *United States v. Kliti*, 156 F.3d 150, 153 (2nd Cir.1998).

## B. Discussion

In the case at bar the government asserts that the defense attorneys' disqualification is warranted for it being a conflicting one where defendant Rivera–Hernández may be denied the effective assistance of counsel given counsel's prior representation of Rivera–Díaz (Rivera–Hernández's father) before Grand Jury proceedings. In so asserting, the government relies in the principles set forth at *In Re Grand Jury Proceedings*, 859 F.2d 1021 (1st Cir.1988).

*In Re Grand Jury Proceedings* relates to a case in which several defendants had been indicted in regards to illegal gambling, an official protection allegedly provided by a corrupt police officer. In spite of the issuance of a true bill, the Grand Jury continued its investigation and subpoenaed the appellant therein to testify. The appellant proceeded to retain an attorney who already represented one of the indicted defendants who, at the time, continued to be a target of the Grand Jury investigation. While so represented, appellant was granted immunity. Thus, on the date appellant (an immunized witness) was to testify before the Grand Jury, the government sought to have defense counsel disqualified asserting counsel represented both: an immunized witness and an indicted defendant who remained a grand

jury target. Although counsel argued no conflict had materialized, the trial court granted the government's motion and disqualified defense counsel from representing appellant. Once the trial court ruling was appealed, the First Circuit Court of Appeals, while recognizing that a grand jury witness has no Sixth Amendment right to counsel, opted to make extensive, at least to some extent, the principles enunciated in *Wheat v. United States*. Thus, the scenario at *In Re Grand Jury Proceedings* involves an attorney who already represents an immunized witness (who may need to consult with him outside the grand jury room) who is going to testify against an actual client of his who continues to be liable to criminal charges. While the Court of Appeals remanded the case for the trial court to consider the *Wheat* factors (*Wheat v. United States* was decided after the trial court's determination), it also stated it could not "say with certainty that they [the facts of the case] meet the *Wheat* standards of serious potential for conflict."

In the case at bar, we are not confronted with a case where counsel undertakes the legal representation of multiple defendants within a case or closely related cases but is rather a case of successive representation by the same attorney. Close scrutiny of the facts reveals that since the initial stages in which Rivera–Díaz learned of the Grand Jury subpoena for Multi–Equipment, he elected to be represented by Attorney Pesquera. It must be noted this corporation at the time did not exist and actually does not exist. Later on, when Rivera–Díaz was personally summoned to appear and testify before the Grand Jury, he once again entrusted his defense to Attorney Pesquera. The record reflects that there was a very short period of time between the date in which he was notified and the date he was to actually appear before the Grand Jury. This certainly ex-

plains why the initial conversation between Rivera–Díaz and Attorney Pesquera, which the latter describes as a very brief telephone conversation, did not allow for the discussion of factual theories or legal controversies. Reportedly, Attorney Pesquera's approach to move to have the Grand Jury subpoena quashed could rightfully obey, as asserted by counsel, to the fact that when so questioned, Rivera–Díaz accepted he could incriminate himself. It is at this stage or shortly thereafter (May 6, 2003) when the government notifies counsel Pesquera that immunity had been extended to Rivera–Díaz and that the target of the investigation was Rivera–Hernandez.[3] The evidence submitted reflects that once again Rivera–Díaz deposited his trust and confidence in Attorney Pesquera, this time by requesting Attorney Pesquera to undertake the legal representation of his son, now the target of the Grand Jury investigation. Not being able to continue representing Rivera–Díaz, Attorney Pesquera so informed the government while announcing Rivera–Díaz's availability to appear before the Grand Jury at a later date. It appears that subsequent conversations between the attorney for the government and Rivera–Díaz took place while Rivera–Díaz was represented by Attorney Gaztambide.

It is undisputed that while testifying before the Grand Jury and most likely not privy to the testimony of prior witnesses, Rivera–Díaz was confronted with the emotional strain and agony of having to implicate his son in illegal conduct. While during the initial stages his testimony might not have been as conclusive as the government wished, there is no doubt that after

consulting with Attorney Gaztambide and been instructed "to tell the truth," Rivera–Díaz was totally forthcoming and responded, without evasiveness, all questions posed directly.

Upon conclusion of Rivera–Díaz's appearance before the Grand Jury, it appears that Attorney Gaztambide was placed on notice that a true bill had been issued against Rivera–Hernández. More so, it is the testimony of Attorney Gaztambide that he was asked by Assistant U.S. Attorney Kellogg whether he could get into the case and help with Rivera–Hernández. Curiously, after this request there was a subsequent request presented to Attorney Gaztambide. This time he was requested whether he could lead Rivera–Hernández to the U.S. Attorney's Office or the FBI offices. This invitation Attorney Gaztambide declined while proceeding to surrender his client before the U.S. Marshal and subsequently guiding him to the U.S. Pretrial Service Office for an interview.

Attorneys Pesquera and Gaztambide have provided assurances they never discussed with Rivera–Díaz the substance of his testimony prior to Rivera–Díaz's appearance before the Grand Jury. The government remains unable to rebut such fact and the undersigned has no reason to disbelieve either one. *United States v. Santiago–Lugo*, 167 F.3d 81, 84 (1st Cir.1999) (Although district court must inquire when advised of potential conflict of interest on the part of defendant's counsel, court may rely on counsel's representation that no such conflict exists). Both attorneys assert their first joint meeting with Rivera–

---

**3.** We must be mindful that as of this date the government had already taken before the Grand Jury (on April 11, 2003) one of the two main witnesses against Rivera–Hernández and the second one was scheduled to testify and did testify before the Grand Jury on May

7, 2003. These two witnesses had direct knowledge of Rivera–Hernández's actions, planning of the scheme, methods used to obtain the monies and one of said witnesses directly participated with Rivera–Hernández in the scheme charged.

Díaz took place after he had testified before the Grand Jury. Being a witness, nothing precluded Rivera–Díaz from discussing his testimony with Attorney's Pesquera and Gaztambide or anyone else. *See Butterworth v. Smith,* 494 U.S. 624, 629, 110 S.Ct. 1376, 108 L.Ed.2d 572 (1990) (the Federal Rules of Criminal Procedure governing grand jury secrecy impose no such obligation on grand jury witnesses); *Halperin v. Berlandi,* 114 F.R.D. 8, 15 (D.Mass.1986) (grand jury witness is free to disclose his oral testimony before the grand jury and free to disclose what documentary evidence he has been compelled to provide to the grand jury). *See also:* Fed.R.Crim.P. 6(3)(2).

While the government identifies Rivera–Díaz as a witness against Rivera–Hernández, the undeniable truth is that there are two other witnesses that, if believed by the jury, clearly establish Rivera–Hernández's participation in the offense(s) charged. While the existence of a scheme to use the name of Rivera–Díaz's company (Multi–Equipment) and its invoices to bill for services never rendered and to receive payment for said services is corroborated by Rivera–Díaz's testimony, the nature of the agreement in which Rivera–Hernández and others entered, the way the monies were prepared and the manner in which the payments were made is established by other witnesses as well. In addition, the government has the actual invoices and checks that do relate to the overt acts alleged.

■ Given the above depicted scenario, the undersigned believes disqualification is suggested neither by prior case law nor by the circumstances. Although afforded with the opportunity to provide the specific grounds to support the existence of an actual or potential conflict, the government has not presented any evidence or description, even if in general terms, regarding the matters over which Rivera–Díaz will be questioned or has knowledge which are not known by his son or were not known by the defense prior to the attorneys being voluntarily approached by Rivera–Díaz immediately after having testified before a Grand Jury. All the government has offered is the assumption or rather speculation that Attorney Pesquera and/or Attorney Gaztambide, at some point prior to Rivera–Díaz's appearance before the Grand Jury as an immunized witness, may have received confidential information or communication which they could now use. Attorneys Gaztambide and Pesquera vehemently deny having received such confidential communication. Both being members of the Bar, knowledgeable of their duty towards their client and the court and bound by the ethical canons and disciplinary rules governing their conduct,[4] their statements, absent evidence to the contrary, must be credited. *Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980) (trial courts appropriately and necessarily rely in large measure upon the good faith and good judgment of defense counsel).

In the case at bar, Rivera–Díaz may be called to testify at the trial of his son. Nonetheless, he has received immunity and is not subject to prosecution, except for perjury or obstruction of justice. The case *per se* is not a complex one nor involves multiple defendants or multiple defense theories. Rivera–Díaz and Rivera–Hernández are not co-defendants nor is there any evidence pointing to the possibility that the attorneys' participation, prior to Rivera–Díaz's appearance before the

---

4. Attorneys admitted within this District shall comply with the American Bar Association's Model Rules of Professional Conduct. Local Rule 83.5(a), effective September 29, 2003, and RPC, specifically in its Preamble, Rules 1.1, 1.2, 1.3 and 1.6.

Grand Jury or during the Grand Jury sessions, jeopardized in any way the Grand Jury's investigation. Based on the above described scenario, it is considered that the disqualification of neither attorney is necessary.

Adhering to principles within our circuit, in *United States v. Gingras*, 2002 WL 31106609 (D.N.H.2002) (not for publication), the trial court refused to disqualify as co-counsel for a criminal defendant an attorney who had previously represented an immunized witness within the case. In *Gingras* an attorney had provided legal representation to a potential government witness. Defense counsel negotiated immunity for the prospective witness and represented him in forfeiture matters that directly related to the case over which he testified before the Grand Jury. Once immunity was granted and the representation of the government witness was completed, the attorney was retained as the co-counsel for the defendant indicted based on the former client's testimony before the Grand Jury. In *Gingras* it was determined there was no conflict in allowing counsel to undertake the legal representation of the indicted defendant. *See: In Re Grand Jury Proceedings*, 859 F.2d at 1026 (cited as holding that a district court should not have disqualified an attorney in the absence of evidence suggesting that the attorney's former client, an immunized witness, had any incriminating or confidential information generating an actual or serious potential conflict). *See also: United States v. Shepard*, 675 F.2d 977 (8th Cir. 1982).

**IV. Conclusion**

In view of the factual scenario at hand and the evidence submitted at the hearing held on the government's motion for disqualification of counsel (Docket No. 14), it is **RECOMMENDED** that the same be **DENIED**.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 72(a) of the Local Rules of Court effective September 29, 2003. Any objections to the same must be specific and must be filed with the Clerk of Court **within ten (10) days** of its receipt. Rule 72(d), Local Rules of Court; Fed.R.Civ.P. 72(b). Failure to timely file specific objections to the Report and Recommendation is a waiver of the right to review by the District Court. *United States v. Valencia–Copete*, 792 F.2d 4 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir.1980). The parties are advised that review of a Magistrate–Judge's Report and Recommendation by a District Judge does not necessarily confer entitlement as of right to a *de novo* hearing and does not permit consideration of issues not raised before the Magistrate–Judge. *Paterson–Leitch v. Massachusetts Elec.*, 840 F.2d 985 (1st Cir.1988).

SO RECOMMENDED.

### *ORDER ON GOVERNMENT'S MOTION FOR RECONSIDERATION OF REPORT AND RECOMMENDATION*

On January 7, 2004, the government requested this Magistrate–Judge to reconsider the Report and Recommendation issued on October 29, 2003, in regards to conflict of interest. For the reasons set forth in a separate order, the government's request (at Docket No. 33) is DENIED.

This Order on Motion for Reconsideration of a Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 72(a) and Local Criminal Rule 157.1 of the Local Rules of Court. Any objections to the same must be specific and must be filed with the Clerk of Court **within ten (10) days of its receipt**. Rule 72(d), Local Rules of Court; Fed.R.Civ.P.

72(b). Failure to timely file specific objections is a waiver of the right to review by the District Court. *United States v. Valencia–Copete,* 792 F.2d 4 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1st Cir.1980). The parties are advised that review of a Magistrate–Judge's Order by a District Judge does not necessarily confer entitlement as of right to a *de novo* hearing and does not permit consideration of issues not raised before the Magistrate–Judge. *Paterson–Leitch v. Massachusetts Elec.,* 840 F.2d 985 (1st Cir. 1988).

**SO ORDERED.**